UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

DEC 17 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST LOUIS

IN THE MATTER OF AN APPLICATION )
OF THE UNITED STATES OF AMERICA )
FOR A WARRANT TO OBTAIN )
RECORDS, LOCATION INFORMATION, )
INCLUDING PRECISION LOCATION )    No. 4:18 MJ 5305 NAB
INFORMATION, CELL SITE )
INFORMATION, AND OTHER )          **FILED UNDER SEAL**
SIGNALING INFORMATION )
ASSOCIATED WITH THE CELLULAR )
TELEPHONE HAVING THE NUMBERS )
(314) 765-5443 )

### AFFIDAVIT

Bryson Wheeler, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration (DEA), duly appointed according to law and acting as such.

### Introduction

I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, currently assigned to the St. Louis Division. I have been a DEA Special Agent for approximately 20 months. Prior to my assignment with DEA, I was a Deputy Sheriff in Kansas for approximately 11 years. During the course of my law enforcement experience, specifically DEA, which specializes in narcotics investigations, I have participated in several complex domestic investigations involving drug trafficking organizations dealing in cocaine, methamphetamine, heroin, marijuana, and other controlled substances. Based on my training, experience, and participation in controlled substance investigations, your affiant is familiar with the methods of operation of drug traffickers. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, the use

of search and arrest warrants, the use of informants, the utilization of undercover agents and the use of court-authorized wire intercepts. I am also familiar with federal criminal laws, particularly those laws relating to narcotics. I am part of an experienced team of narcotics investigators that have participated in numerous drug trafficking investigations utilizing various investigative techniques.

The facts alleged in this affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses. As this affidavit is submitted for the limited purpose of establishing probable cause to locate and monitor the location of a cellular telephone as part of a criminal investigation, it does not set forth all of the my knowledge regarding this matter.

Upon information and belief, and as explained in greater detail below, the T-Mobile cellular telephone bearing number **(314) 765-5443** and subscribed to Ivan Utrera 3035 Kingsley Drive Florissant, MO 63033 (hereinafter the "**subject cellular telephone**") has been used, and is presently being used in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 846 and 841(a)(1) (hereinafter referred to as "the subject offenses"), by Adan UTRERA, and others known and unknown and subscribed to.

The present affidavit is being submitted in connection with an application of the Government for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling information, including pen register information, in an effort to locate and monitor the location of the **subject cellular telephone**.

Your affiant further states that there is probable cause to believe that the location information associated with the **subject cellular telephone** will lead to evidence of the aforementioned subject offenses as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

## Investigation and Probable Cause

In October of 2018, DEA St. Louis Group 32 investigators met with a St. Ann Missouri Police Department Confidential Source#1 [1] (CS#1) who had information about crystal methamphetamine and cocaine trafficking in the St. Louis Metro area. CS#1 explained to investigators that Ramon Perez and other individuals have been receiving kilogram quantities of cocaine in the St. Louis area for years. As explained in further detail below, investigators identified Adan UTRERA as a cocaine source of supply to Ramon Perez.

On November 28, 2018, members of DEA St. Louis Task Force Group 32 utilized CS#1 to purchase approximately four ounces of cocaine from Ramon PEREZ. Investigators provided CS#1 with $4,800 in Official Advance Funds (OAF) for the controlled purchase. Investigators searched CS#1 and CS#1's vehicle prior to and after the purchase and did not locate any contraband. Prior to CS#1 meeting and picking up Perez to conduct the narcotics transaction, Perez told CS#1 that his (Perez) "guy" (supplier) would be bringing the cocaine to them at the meeting location. At approximately 6:45 p.m., DEA investigators observed CS#1 and Perez exit a store at the meeting location. Investigators observed a black Nissan Altima parked next to Perez's

---

[1] CS#1 is cooperating for judicial considerations. He/she was arrested by DEA in 2018 and charged with various federal charges including but not limited to conspiracy to distribute crystal methamphetamine. He/she has been proven reliable by purchasing 2 ounces of cocaine from PEREZ on November 1, 2018 and independent corroboration of other narcotic traffickers.

vehicle. Investigators observed a heavy-set Hispanic male occupying the Nissan Altima. Additionally, investigators observed Perez get into the passenger side of the Nissan Altima and speak with an individual, later identified as Adan UTRERA. Investigators watched as Perez got out of UTRERA's car and got back into his (Perez') own car with CS#1. CS#1 and Perez left the meeting location, as did UTRERA. CS#1 later met with investigators, released possession of the 4 ounces of cocaine which was seized by controlling investigators. CS#1 confirmed the purchase of 4 ounces of powder cocaine from Perez through UTRERA. In a post-buy interview with investigators, CS#1 advised that Perez exited the car, got into the car with UTRERA and returned to the car with the 4 ounces of cocaine. DEA investigators previously observed this sequence of events.

On December 13, 2018, DEA investigators Task Force Office Robert Lang, Special Agent Bryson Wheeler, and Special Agent Michael Carnucci met with Confidential Source#2[2] (CS#2) and discussed the information that CS#2 had regarding Adan UTRERA. CS#2 told investigators that UTRERA is a known distributor of ounces of cocaine and crystal methamphetamine. The CS#2 advised that UTRERA communicates using telephone number **(314) 765-5443 (the subject cellular telephone)**. As observed and under the direction of controlling investigators, CS#2 conducted the following text message conversation with UTRERA who was utilizing the **subject cellular telephone**. The above text message conversation was conducted in Spanish, saved by

---

[2] CS#2 is currently working for monetary compensation. CS#2's information has been shown to be reliable in this investigation and other investigations have corroborated facts provided by CS#2. No information has been derived by DEA that would indicate that CS#2 is providing false information in any manner.

4

CS#2, and sent to investigators via text message. This message photo was then translated by Spanish speaking DEA personnel for use.

> **CS#2:** Hey, crazy. How are you? Is everything okay? I need something for Monday. That way I'm ready for Christmas.
>
> **UTRERA:** Yeah, crazy. Just tell me how much you need
>
> **CS#2:** How much will you give it to me for? It is ice?
>
> **UTRERA:** 6 per notebook, man, so you'll do it
>
> **CS#2:** I just have to check it first, crazy. This is for me. I am going to see how it sells. My buddy from Springfield is the one that wants the notebook. He has people who can move it
>
> **CS#2:** Can you let me have 1?

Based on training and experience, investigators believe that this text message conversation demonstrates that UTRERA is willing to sell CS#2 one pound, aka "notebook," of crystal methamphetamine for $6,000.

As explained by CS#2, after this message exchange, UTRERA utilized the **subject cellular telephone**, and placed an incoming phone call to CS#2. The phone conversation was not conducted in the presence of DEA investigators. Telephone toll information, received by service of administrative subpoena, later confirmed that this phone call took place. During this call, UTRERA advised CS#2 that the price was $700 for one ounce of crystal methamphetamine and confirmed that he (UTRERA) would be ready to meet CS#2 on the following Monday to meet up and make a transaction.

Based upon my training and experience, I am aware that persons engaged in the illegal distribution of narcotics use cellular telephones in furtherance of their drug trafficking operations. Based upon the totality of this investigation, it is my opinion that there is probable cause to believe

that the **subject cellular telephone** is being used by an individual who is conspiring to commit, and is committing illegal narcotics distribution and may be planning to commit an additional crime. The precision location information being sought, relative to the **subject cellular telephone,** will further the investigation of the drug trafficking activities and possible crimes against persons committed by UTRERA, who investigators believe is using the **subject cellular telephone**, including but not limited to assisting in surveillance, determining the location of stash houses, and discerning other patterns of illegal drug trafficking activity.

The investigation has clearly demonstrated that the **subject cellular telephone** is being used in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 846 and 841(a)(1) (the subject offenses). It is critical that the investigative team be able to locate and monitor the movements of the **subject cellular telephone** thereby assisting in the identification of the co-conspirators and the seizure of narcotics. Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

### Investigative Considerations and Techniques

Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

A. Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times

and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

   B. Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received. For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact. Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities. Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

   C. Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

   D. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the

7

embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

  E. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

  F. Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records. This information is sometimes referred to as E-911 phase II data, GPS data or latitude-longitude data. In the Eastern District of Missouri, such information is often referred

to as "precision location information" or "PLI" data.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers.   Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

In order to locate the **subject cellular telephone** and monitor the movements of the phone, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the government.  The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may seek a warrant to compel T-MOBILE, any telecommunication service providers reflected in Attachment 1, to include providers of any type of wire and/or electronic communications   (herein incorporated by reference), and any other applicable service providers, to provide precision location information, including Global Position System information (if available), transactional records, including cell site location information, and pen register and trap-and-trace data.

None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass.  Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only.   Furthermore, the criminal conduct being investigated is not limited to the daytime.   Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only.   Accordingly, the investigative agency(ies), and other authorized

federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

The monitoring of the location of the **subject cellular telephone** by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

### Conclusion

Based on the above information, there is probable cause to believe that the **subject cellular telephone** is being used to promote and facilitate a conspiracy to distribute narcotics and the requested authorization would provide relevant evidence of the conspiracy. There is likewise probable cause to conclude that locating and monitoring the movements of the **subject cellular telephone** will lead to the relevant evidence concerning violations of Title 21, United States Code, Sections 846 and 841(a)(1).

12/17/2018
DATE

Bryson Wheeler
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this ___17th___ day of December, 2018.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

## LIST OF TELECOMMUNICATION SERVICE PROVIDERS

T-Mobile
and

| | | | |
|---|---|---|---|
| 01 Communications | Egyptian Telephone | Mid-Atlantic | Socket Telecom |
| Access Line Communication | Electric Lightwave, Inc. | Midvale Telephone Exchange | Spectrum |
| ACN, Inc. | Empire Paging | Mobile Communications | Sprint |
| ACS | Ernest Communications | Mound Bayou Telephone Co. | SRT Wireless |
| Aero Communications, Inc. (IL) | EZ Talk Communications | Mpower Communications | Star Telephone Company |
| Afford A Phone | FDN Communications | Navigator Telecommunications | Start Wireless |
| Airvoice Wireless | Fibernit Comm | | Sugar Land Telephone |
| Alaska Communications | Florida Cell Service | NE Nebraska Telephone | Sure West Telephone Company |
| Alhambra-Grantfx Telephone | Florida Digital Network | Netlink Comm | Talk America |
| Altice USA | Focal Communications | Network Services | Tele Touch Comm |
| AmeriTel | Frontier Communications | Neustar | Telecorp Comm |
| AOL Corp. | FuzeBox, Inc. | Neutral Tandem | Telepak |
| Arch Communication | Gabriel Comm | Nex-Tech Wireless | Telispire PCS |
| AT&T | Galaxy Paging | Nexus Communications | Telnet Worldwide |
| AT&T Mobility | Global Communications | NII Comm | Tex-Link Comm |
| Bell Aliant | Global Eyes Communications | North Central Telephone | Time Warner Cable |
| Big River Telephone | Global Naps | North State Comm | T-Mobile |
| Birch Telecom | Grafton Telephone Company | Northcoast Communications | Total Call International |
| Blackberry Corporation | Grand River | Novacom | Tracfone Wireless |
| Brivia Communications | Grande Comm | Ntera | Trinity International |
| Broadview Networks | Great Plains Telephone | NTS Communications | U-Mobile |
| Broadvox Ltd. | Harrisonville Telephone Co. | Oklahoma City SMSA | United Telephone of MO |
| Budget Prepay | Heartland Communications | ONE Communications | United Wireless |
| Bulls Eye Telecom | Hickory Telephone | ONSTAR | US Cellular |
| Call Wave | Huxley Communications | Optel Texas Telecom | US Communications |
| Cbeyond Inc. | iBasis | Orion Electronics | US LEC |
| CCPR Services | IDT Corporation | PacBell | US Link |
| Cellco Partnership, d/b/a Verizon Wireless | Illinois Valley Cellular | PacWest Telecom | US West Communications |
| | Insight Phone | PAETEC Communications | USA Mobility |
| Cellular One | Integra | Page Plus Communications | VarTec Telecommunications |
| Cellular South | Iowa Wireless | Page Mart, Inc. | Verisign |
| Centennial Communications | IQ Telecom | Page Net Paging | Verizon Telephone Company |
| CenturyLink | J2 Global Communications | Panhandle Telephone | Verizon Wireless |
| Charter Communications | Leap Wireless International | Peerless Network | Viaero Wireless |
| Chickasaw Telephone | Level 3 Communications | Pineland Telephone | Virgin Mobile |
| Choctaw Telephone Company | Locus Communications | PhoneTech | Vonage Holdings |
| Cimco Comm | Logix Communications | PhoneTel | Wabash Telephone |
| Cincinnati Bell | Longlines Wireless | Preferred Telephone | Wave2Wave Communications |
| Cinergy Communications | Los Angeles Cellular | Priority Communications | Weblink Wireless |
| Clear World Communication | Lunar Wireless | Puretalk | Western Wireless |
| Com-Cast Cable Comm. | Madison River Communications | RCN Telecom | Westlink Communications |
| Commercial Communications | | RNK Telecom | WhatsApp |
| Consolidated Communications | Madison/Macoupin Telephone Company | QWEST Communications | Windstream Communications |
| Cox Communications | | Sage Telecom | Wirefly |
| Cricket Wireless | Mankato Citizens Telephone | Seren Innovations | XFinity |
| Custer Telephone Cooperative | Map Mobile Comm | Shentel | XO Communications |
| DBS Communications | Marathon Comm | Sigecom LLC | Xspedius |
| Delta Communications | Mark Twain Rural | Sky Tel Paging | Yakdin Valley Telephone |
| Detroit Cellular | Max-Tel Communications | Smart Beep Paging | YMAX Communications |
| Dobson Cellular | Metro PCS | Smart City Telecom | Ztel Communications |
| | Metro Teleconnect | | |

**ATTACHMENT 1, TO INCLUDE PROVIDERS OF ANY TYPE OF WIRE AND/OR ELECTRONIC COMMUNICATIONS**          Last Update: 06/21/2018